**EXHIBIT B**

*Ex Parte Motion Term*

At ~~I.A.S. Part~~ _____ of the Supreme Court of the
State of New York, held in and for the County
of New York, located at 60 Centre Street,
Room *315*, New York, New York, 10007 on
the *10th* day of May, 2007

PRESENT:     Hon. *MARTIN SCHOONFELD* J.S.C.

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

In the Matter of the Application of

UNITHREE INVESTMENT CORP.,

                                        Petitioner,

        - against -

SERVICE EMPLOYEES INTERNATIONAL UNION,
LOCAL 32BJ,

                                        Respondent.

**ORDER TO SHOW
CAUSE**

Index No. *106296/2007*

Upon reading the accompanying petition of Petitioner Unithree Investment Corp.

("Petitioner"), dated May 8, 2007, the annexed affidavit of Samuel Grosso and the exhibits

thereto, including the notice of intention to arbitrate of Respondent Service Employees

International Union, Local 32BJ ("Respondent"), dated April 19, 2007, the annexed affidavit of

Randy S. Gidseg, Esq. and the exhibit thereto, and Petitioner's accompanying Memorandum of

Law,

NOW, THEREFORE let the Respondent show cause before this Court at I.A.S. Part *46*,

located at 60 Centre Street, Room *325*, New York, New York 10007 on ~~May 5~~ *June 5*, 2007 at 9:30

a.m., or as soon thereafter as counsel may be heard, why an Order should not be made and

entered herein pursuant to Sections 7503(b) and (c) of the New York Civil Practice Law and

Rules preliminarily and permanently enjoining Respondent from pursuing arbitration related to

10552886.1

any claim that Penoye Rainey was unjustly terminated from his employment at 240-60-80 Park

Hill Avenue on April 3, 2007, including but not limited to any such claim initiated by a notice of

intention to arbitrate served by Respondent upon the Petitioner on or about April 19, 2007 (the

"Notice"), and for such other and further relief as this Court deems just and proper; and it is

further

ORDERED that pending the hearing of the Petition, all arbitration proceedings related to

any claim that Penoye Rainey was unjustly terminated from his employment at 240-60-80 Park

Hill Avenue on April 3, 2007, including but not limited to any such claim initiated by the Notice,

shall be and the same hereby are stayed; and it is further

ORDERED that oral argument shall be required on the return date of this motion; and it

is further

ORDERED that service by personal or overnight delivery to Respondent and/or counsel
*or by registered or certified mail, return receipt requested.*

for Respondent of a copy of this Order together with the papers upon which it is based on or

before the 11th day of May, 2007, shall be deemed good and sufficient service; and it is further

ORDERED that Respondent shall serve, by personal or overnight delivery, their Answer

and supporting affidavits, if any, at least seven (7) days before such time as this Order to Show

Cause is returnable and a Reply, together with supporting affidavits, if any, shall be served, by

personal delivery, one (1) day before such time.

ENTER!

/s/ MARTIN SCHOONFELD
J.S.C.

*oral argument directed.*

/s/ MARTIN SCHOONFELD
J.S.C.

**Grosso Affidavit**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of

UNITHREE INVESTMENT CORP.,

                                        Petitioner,

        - against -

SERVICE EMPLOYEES INTERNATIONAL UNION,
LOCAL 32BJ,

                                        Respondent.

**AFFIDAVIT OF
SAMUEL GROSSO IN
SUPPORT OF
PETITION TO STAY
ARBITRATION**

Index No.
*106296/2007*

STATE OF NEW YORK      )
                       ) SS:
COUNTY OF RICHMOND     )

        SAMUEL GROSSO, being duly sworn, deposes and states,

        1.      I am a Vice President for Unithree Investment Corp. (the "Company").  I make

this Affidavit in support of the Company's petition for a preliminary injunction and a permanent

stay of arbitration.

        2.      On or about April 19, 2007, Service Employees International Union, Local 32BJ

(the "Respondent" or the "Union") served a notice of intention to arbitrate upon the Company

dated April 19, 2007 (the "Notice"), which was received by the Company on or about April 19,

2007.  A copy of the Notice is attached as Exhibit ("Ex.") A.

        3.      In the Notice, the Union demands arbitration concerning a claim that Penoye

Rainey (the "Employee"), a "member" of the Union, was "unjustly terminated" from his

employment at 240-60-80 Park Hill Avenue, Staten Island, New York (the "Building") "effective

April 3, 2007." Ex. A.

4.    The Notice further states that the Union has demanded arbitration because the Company is a "signatory to a Collective Bargaining Agreement which designates the Office of the Contract Arbitrator as Arbitrator in the event of disputes." Ex. A. The Notice does not, however, identify the specific collective bargaining agreement under which arbitration is sought, nor does it attach a copy of any such agreement.

5.    The only agreement ever entered into by the Company and the Union concerning the Building is an "Apartment House Agreement 2003" dated May 20, 2005 (the "Agreement"), a copy of which is attached hereto as Exhibit B.

6.    Although the Agreement contains an arbitration provision (see Ex. B, pp. 2-3), it also provides that it shall expire, by its terms, on April 20, 2006. See Ex. B, p. 4 ("This Agreement shall expire on April 20, 2006."). Accordingly, on April 20, 2006, the Agreement expired.

7.    After the Agreement expired, the parties did seek to negotiate concerning the establishment of a new collective bargaining agreement for the Building. A copy of a letter from me to the Union confirming a negotiation session between the parties on March 29, 2007 is attached as Exhibit C. Although the parties have engaged in substantive negotiations concerning a new agreement, to date, the Company and the Union have not entered into any new agreement concerning the Building. Accordingly, after April 20, 2006, there was no agreement at all between the parties concerning the Building, and, in particular, no agreement to arbitrate concerning the Building.

8.    Notwithstanding the absence of an agreement to arbitrate after April 20, 2006, the Union now demands arbitration concerning the termination of the Employee from his

10553113                                    - 2 -

employment at the Building on April 3, 2007, which occurred nearly a full year after the

Agreement expired.  See Ex. A.

9.    In response to the Union's Notice, the Office of the Contract Arbitrator ("OCA")

has scheduled an arbitration hearing for May 23, 2007.  A copy of the OCA's Notice of Hearing

is attached as Exhibit D.

10.    Because there was no agreement to arbitrate after April 20, 2006, the Company

asks this Court to issue a preliminary injunction and a permanent stay of arbitration over any

arbitration proceeding concerning the termination of the Employee on April 3, 2007.

11.    To date, the Company has not participated in the arbitration proceeding demanded

by the Union in their Notice.

14.    No prior application for the relief requested in the Company's Petition has been

made to this Court or any other Court.

_SAMUEL GROSSO_

SAMUEL GROSSO

Sworn to before me
this 7th day of May, 2007

Notary Public
State of New York

MICHAEL A. REDI
NOTARY PUBLIC, STATE OF NEW YORK
ID No. 01AU6112341
QUALIFIED IN RICHMOND COUNTY
MY COMMISSION EXPIRES 07/08/2008

10553113

**Gidseg Affidavit**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

In the Matter of the Application of

UNITHREE INVESTMENT CORP.,

Petitioner,

- against -

SERVICE EMPLOYEES INTERNATIONAL UNION,
LOCAL 32BJ,

Respondent.

**AFFIDAVIT OF
RANDY S. GIDSEG IN
SUPPORT OF
PETITION TO STAY
ARBITRATION**

Index No.
*106296 /2007*

STATE OF NEW YORK    )
                     ) SS:
COUNTY OF NEW YORK   )

RANDY S. GIDSEG, being duly sworn, deposes and states,

1.     I am an attorney with the law firm of Nixon Peabody LLP, attorneys for Petitioner

Unithree Investment Corp. (the "Company"). I submit this affidavit in support of the Company's

petition for a preliminary injunction and a permanent stay of arbitration.

2.     On May 7, 2007, I sent a letter, via overnight mail, to Joanne Davis, Complaint

Director for Respondent Service Employees International Union, Local 32BJ (the "Respondent"

or the "Union"), advising her of the Company's intention to seek, on the morning of May 9,

2007, in the Supreme Court of the State of New York, County of New York, located at 60 Centre

Street, New York, New York 10007, a preliminary injunction and permanent stay of arbitration

concerning the Union's notice of intention to arbitrate dated April 19, 2007 concerning a claim

that Penoye Rainey was "unjustly terminated" from his employment at 240-60-80 Park Hill

10558207.1

Avenue, Staten Island, New York "effective April 3, 2007." A copy of that letter is attached as

Exhibit 1.

3.      No prior application for the relief requested in the Company's Petition has been

made to this Court or any other Court.

Dated: May 8, 2007
       New York, New York

RANDY S. GIDSEG

Sworn to before me
this 8ᵗʰ day of May, 2007

Notary Public
State of New York

BETH FITZGERALD
Notary Public, State of New York
No. 47-74680
Qualified in New York County
Commission Expires May 31, 20 10

10553113

**Exhibit 1**

# NIXON PEABODY LLP
### ATTORNEYS AT LAW

437 Madison Avenue
New York, New York 10022-7001
(212) 940-3000
Fax: (212) 940-3111

Randy S. Gidseg
Direct Dial: (212) 940-3047
Direct Fax: (866) 479-5045
E-Mail: rgidseg@nixonpeabody.com

May 7, 2007

**<u>Via Overnight Mail</u>**

Joanne Davis
Complaint Director
Service Employees International Union, Local 32BJ
101 Avenue of the Americas
New York, New York 10013

> *Re:*  **240-60-80 Park Hill Avenue**
> **Case #24864**
> **Penoye Rainey**

Dear Ms. Davis:

This firm represents Unithree Investment Corp. (the "Company").

We are in receipt of your April 19, 2007 letter to the Office of the Contract Arbitrator, wherein you indicate that the Union intends to arbitrate concerning its claim that Penoye Rainey was "unjustly terminated" from his employment at 240-60-80 Park Hill Avenue, Staten Island, New York "effective April 3, 2007." Please be advised that, in response to your letter, the Company intends to seek, on the morning of May 9, 2007, in the Supreme Court of the State of New York, County of New York, located at 60 Centre Street, New York, New York 10007, a preliminary injunction and permanent stay with respect to this arbitration.

Sincerely,

Randy S. Gidseg

cc:    Dawn E. Cervi, Administrator, Office of the Contract Arbitrator

10558300.1

**Exhibit A**



**32BJ**

**SEIU**

**Stronger Together**

SERVICE EMPLOYEES
INTERNATIONAL UNION
CTW, CLC

**MICHAEL P. FISHMAN**
President

**KEVIN J. DOYLE**
Executive Vice President

**HÉCTOR J. FIGUEROA**
Secretary-Treasurer

**KYLE BRAGG**
Vice President

**LENORE FRIEDLAENDER**
Vice President

**BRIAN LAMBERT**
Vice President

**VALARIE LONG**
Vice President

**Online at**
www.seiu32BJ.org

**Local 32BJ Headquarters**
101 Avenue of the Americas
New York, NY 10013-1991
212.388.3800

**Connecticut District**
800.228.5253
Hartford 860.560.8674
Stamford 203.602.6615

**Westchester District**
914.637.7000

**Long Island District**
516.579.4020

**New Jersey District**
866.5JANITOR
973.824.3225

**Philadelphia District**
215.226.3600

**District 82**
Washington 202.387.3211
Baltimore 410.225.7511
Silver Spring 301.562.9301

---

April 19, 2007

Office of the Contract Arbitrator
7 Penn Plaza, Suite 301
New York, N.Y. 10001

Re:    **240-60-80 Park Hill Avenue**
       **Case #24864**
       **Penoye Rainey**

Gentlemen:

The employer at the above mentioned building is signatory to a Collective Bargaining Agreement which designates the Office of the Contract Arbitrator as Arbitrator in the event of disputes.

The above member, employed at the above building as a porter for twenty years, claims he was unjustly terminated effective April 3, 2007.

We are claiming reinstatement to his prior position with full back pay, benefits, seniority and contributions to the benefit funds lost by his unjust termination.

The employer has failed or refused to adjust this matter; therefore, Mr. Anthony Spataro, Supervisor of District #9, recommends that the dispute be set down for a hearing before the Contract Arbitrator.

The employer is:      Kimso Apartments LLC
                      c/o Unithree Investments Company
                      240 Park Hill Avenue
                      Staten Island, N.Y. 10304

Very truly yours,

Joanne Davis
Complaint Director

CC:    Kimso Apartments LLC c/o Unithree Investments Company

**STATUTORY NOTICE ATTACHED -**

36

# STATUTORY NOTICE ATTACHMENT

STATUTORY NOTICE – PURSUANT TO ARTICLE 7503 (C) OF THE NEW YORK CIVIL PRACTICE LAW AND RULES, NOTICE IS HEREBY GIVEN BY THE UNION OF INTENTION TO ARBITRATE AS SET FORTH IN A CONTRACT BETWEEN THE EMPLOYER AND LOCAL 32BJ.

UNLESS YOU APPLY TO STAY THE ARBITRATION WITHIN 20 DAYS AFTER SERVICE OF THIS NOTICE, YOU SHALL BE PRECLUDED FROM OBJECTING THAT A VALID AGREEMENT WAS NOT MADE OR HAS NOT BEEN COMPLIED WITH AND FROM ASSERTING IN COURT THE BAR OF A LIMITATION OF TIME.

Exhibit B

# Apartment House Agreement 2003

**Agreement** between the undersigned EMPLOYER, hereinafter termed the "Employer" and SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 32BJ, AFL-CIO, hereinafter termed the "Union," for the following premises:

## 240-60-80 Park Hill Ave

Wherein it is mutually agreed as follows:

### Article I — Recognition and Union Status

1. This agreement shall apply to all classifications of service employees under the jurisdiction of the Union, which is recognized as their exclusive bargaining representative. Article VII of this Agreement shall also apply to employees of cleaning and maintenance contractors who employ employees in any building committed to this Agreement working in any job category covered by this Agreement.

Work performed pursuant to the terms of this Collective Bargaining Agreement shall not be performed by persons not covered by the bargaining agreement except as provided in Article VII.

2. There shall be a Union Shop, requiring Union membership by every employee as a condition of employment after the thirtieth (30th) day following employment, or the execution date of this Agreement, whichever is later. The Union shall not request the Employer to discharge or otherwise discriminate against any employee except in compliance with law.

In the event the Union security provision of the agreement is held to be invalid, unenforceable or of no legal effect generally or with respect to any building because of interpretation or a change of federal or state statute, city ordinance or rule or decision of any government administrative body, agency or subdivision, the permissible Union security clause under such statute, decision or regulation shall be enforceable as a substitute for the Union security clause provided for herein.

3. Upon receipt by the Employer of a letter from the Union's Secretary-Treasurer requesting an employee's discharge because he has not met the requirements of this Article, unless the Employer questions the propriety of so doing, he shall be discharged within fifteen (15) days of said notice if prior thereto he does not take proper steps to meet said requirements. If the Employer questions the propriety of the discharge he shall immediately submit the matter to the Arbitrator. If the Arbitrator determines that the employee has not complied with Section 2, he shall be discharged within ten (10) days after written notice of the determination has been given to the Employer.

4. The Union will hold the Employer harmless for any liability arising from any discharge asked by the Union pursuant to the provisions of this Article provided the Employer has done nothing to cause or increase its own liability concerning removal of employees.

5. The Employer shall be responsible for unpaid dues after receipt of notice provided for in this section and exhaustion of contractual remedies. The Employer's obligation shall begin fifteen (15) days after such notice or if the Employer questions the discharge after the final determination of the Arbitrator.

6. Nothing in this Article shall be construed as an admission that the Employer or his employees are engaged in interstate commerce, in an activity affecting interstate commerce, in the production of goods for interstate commerce, or that the provisions of the Labor-Management Relations Act, as amended, cover any building.

7. The Employer shall on execution of this Agreement furnish to the Union a complete list of the names and home addresses of all employees covered by the Agreement, plus their hours of employment and hourly rate of pay. The Employer shall immediately notify the Union in writing of the name and home address of each new employee engaged by the Employer.

The Employer shall notify the Union in writing, as soon as a cancellation of an account becomes effective where Union members are employed and the Employer shall notify the Union when he acquires a new building service job.

8. For the purpose of determining the employees who should be members of the Union and to insure the terms of this Agreement are being complied with, the Union shall have the right to inspect the Employer's Social Security reports and all payroll and tax records, and any other record of employment and the Employer shall make such records available to the Union upon request thereof. The Union shall have the right to expedited arbitration in the event the Employer fails to comply with this right of inspection. The Health, Pension, Training, Legal and Supplemental Retirement and Savings (SRSP) Funds shall have the same right to inspect as the Union.

9. The Union does hereby authorize the Employer and the Employer does hereby agree to deduct monthly dues, initiation fees, COPE checkoff, any assessments, fines or other fees due to the Union from each employee covered by this Agreement, from the wages due to each and every member during the term of this Agreement. The Employer agrees that such deductions shall constitute Trust Funds and will be forwarded by the Employer to the Union not later than the twentieth (20th) day of each and every current month. It is understood and agreed that the Employer will make such deductions and authorizations will be signed by the employees affected, all in accordance with the pertinent provisions of existing law. The Union will furnish to the Employer the necessary authorization forms.

If the Employer fails to remit to the Union the dues deducted in accordance with this section by the twentieth day, the Employer shall pay interest on such dues at the rate of one percent per month beginning on the twenty-first day, unless the Employer can demonstrate the delay was for good cause due to circumstances beyond its control. The Union agrees to waive interest for the first six months. *BE*

If a signatory does not revoke his authorization at the end of a year following date of authorization, or at the end of the current contract, whichever is earlier, it shall be deemed a renewal of authorization, irrevocable for another year, or until the expiration of the next succeeding contract, whichever is earlier.

## ARTICLE II—Wages, Hours and Working Conditions; Effective Date

1. The wages, hours, terms and conditions of employment set forth in Article IX of this Agreement are hereby made part hereof.

2. This Agreement shall be effective as of April 21, 2003, except as otherwise provided herein.

3. There shall be no lowering of any standards of working conditions of any employee in the employ of the Employer as a result of this Agreement. All employees enjoying higher wages, higher benefits or better working conditions than provided for herein either pursuant to a prior collective bargaining agreement or otherwise, shall continue to enjoy at least the same.

A change of schedules or duties, so long as required relief and luncheon periods are reasonably spaced, shall not violate this Section provided the employee and the Union shall be given at least one week's advance notice and such change is reasonable. The notice for shift change i.e., change in work hours or days off, shall be three (3) weeks. However, where as of April 21, 2003, an employee regularly received consecutive days off, the practice shall continue, and if any such employee leaves his position for any reason, his replacement shall also receive consecutive days off.

4. There is presently an Agreement between the Union and the Realty Advisory Board on Labor Relations, Inc. (hereinafter "RAB") containing provisions for negotiating for the rescheduling of employees' quitting time for the safety of night workers. It is understood and agreed that any awards, decisions or agreements concluded between the Union and the RAB shall become binding upon the parties hereto upon the same terms and effective dates.

## ARTICLE III—Management Rights

1. The Union recognizes management's right to direct and control its policies subject to the obligations of this Agreement.

2. Employees will cooperate with management within the obligations of this Agreement to facilitate efficient building operations.

3. Employees shall not be discharged by the Employer except for justifiable cause. If any employee is unjustly discharged, he shall be reinstated to his former position without loss of seniority or rank and without salary reduction. The Arbitrator may determine whether, and to what extent, the employee shall be compensated by the Employer for time lost.

4. Any employee who is discharged shall be furnished a written statement of reason(s) for such discharge no later than five (5) days after the date of discharge.

## ARTICLE IV—No Strikes or Lockouts

1. There shall be no work stoppage, strike, lockout or picketing, except as provided in Section 2 and 3 of this Article. If this provision is violated, the matter may be submitted immediately to the Arbitrator.

2. If a judgment or Arbitrator's award against any Employer is not complied with within ten (10) days after such award is sent by registered or certified mail to the Employer, at its last known address, the Union may order a stoppage of work, strike or picketing in the building involved, to enforce the award or judgment, and it may also compel payment of lost wages to any employee engaged in such activity. Upon compliance with the award and/or judgment and payment of lost wages, such activity shall cease.

3. The Union may order a work stoppage, strike or picketing in a building where work previously performed by members of the Union or within its jurisdiction is being performed by persons outside of the bargaining unit anywhere in the building, provided that seventy-two (72) hours written or telegraphic notice is given to the Employer of the Union's intention to do so.

4. The Union shall not be held liable for any violation of this Article where it appears that it has taken all reasonable steps to avoid and end any such violation.

5. No employee covered by this Agreement shall be required by the Employer to pass lawful picket lines established by any local of Service Employees International Union in an authorized strike.

## ARTICLE V—Arbitration

A grievance shall first be taken up directly between the Employer and the Union. Grievances shall be resolved, if possible, within 72 hours after they are initiated, and if not so resolved, shall be promptly submitted to the Office of the Contract Arbitrator. Counsel of the Union and the Employer may be present at any Grievance Procedure meeting.

Any dispute or grievance between the Employer and the Union which cannot be settled directly by them shall be submitted to the Office of the Contract Arbitrator, including issues initiated by the Trustees pursuant to General Clause 40. The Office of the Contract Arbitrator shall initially schedule a hearing within two (2) to fifteen (15) days after either party has served written notice upon the Office of the Contract Arbitrator with copy to the other party of any issue to be submitted. The oath-taking, and the period, and the requirements for service of notice in the form prescribed by statute are hereby waived.

Any grievance, except as otherwise provided herein and except a grievance involving basic wage violations including Pension, Health, Training, Legal and SRSP Fund contributions as set forth in General Clause 40, shall be presented to the Employer in writing within one hundred and twenty (120) days of its occurrence, except for grievances involving suspension without pay or discharge which shall be presented within forty-five (45) days, unless the Employer agrees to an extension. The Arbitrator shall have the authority to extend the above time limitations for good cause shown.

A written award shall be made by the Arbitrator within ten (10) days after the hearing closes. If any award is not timely rendered, either the Union or the Employer may demand in writing of him that the award must be made within ten (10) days. If no decision is rendered within that time, either the Union or the Employer may notify the Arbitrator of the termination of his office as to all issues submitted to him in that proceeding. By mutual consent of the Union and the Employer the time of both the hearing and decision may be extended in a particular case. If a party, after due written notice, defaults in appearing before the Arbitrator, an award may be rendered upon the testimony of the other party.

Due written notice means mailing, telegraphing, or hand delivery to the address specified in this Agreement or in an assumption.

No more than one adjournment shall be granted by the Arbitrator without consent of the opposing party.

All Union claims are brought by the Union alone and no individual shall have the right to compromise or settle any claim without the written permission of the Union.

Arbitration expenses shall be borne equally by the parties unless otherwise specified herein.

In the event that the Union appears at an arbitration without the grievant, the Arbitrator shall conduct the hearing provided it is not adjourned. The Arbitrator shall decide the case based upon the evidence adduced at the hearing.

The procedure herein with respect to matters over which a Contract Arbitrator has jurisdiction shall be the sole and exclusive method for the determination of all such issues, and the Arbitrator shall have the power to award appropriate remedies, the award being final and binding upon the parties and the employee(s) or Employer(s) involved. Nothing herein shall be construed to forbid either party from resorting to court for relief from or to enforce rights under, any award.

There are presently agreements between the Union and the RAB, designating the Office of the Contract Arbitrator — Building Service Industry, as contract arbitrator for all disputes. It is agreed by the parties hereto that the arbitrators serving in such office shall also serve as contract arbitrators under this Agreement. The arbitrators currently are: Howard Edelman, Theodore Lang, Marilyn Levine, Robert Herzog, John Anner, Bernard Young, Nicholas Cooney, Stuart Bauchner, Noel Berman, John Dorsey, Randi Lowitt, and Earl Pfeffer. Any additional arbitrators designated to serve in the Office of the Contract Arbitrator by the Union and the RAB shall be deemed added to the list of Contract Arbitrators for this Agreement.

In the event that one or more of the contract arbitrators is terminated at the request of the Union, pursuant to the agreement between the Union and the RAB, such arbitrator(s) shall be automatically deleted as contract arbitrator under this Agreement.

In the event that one or more of the contract arbitrators is terminated from the Contract Arbitrator's office at the request of the RAB, the Employer may, upon thirty (30) days written notice to the Union, terminate the services of any such Arbitrator(s).

Should either party fail to abide by an arbitration award within two weeks after such award is sent by registered or certified mail to the parties, either party may, in its sole and absolute discretion, take any action necessary to secure such award including but not limited to suits at law. Should either party bring such suit it shall be entitled, if it succeeds, to receive from the other party all expenses for counsel fees and court costs.

In any proceeding to confirm an award, service may be made by registered or certified mail within or without the State of New York as the case may be.

Grievants attending grievances and arbitrations shall be paid their regularly scheduled hours during such attendance.

If a grievant requires an employee of the building to be a witness at the hearing and the Employer adjourns the hearing, the employee witness shall be paid by the Employer for his regularly scheduled hours during attendance at such hearing. This provision shall be limited to one employee witness.

## ARTICLE VI—Sale or Transfer of Building

1. (a) In case of any sale, lease, transfer or assignment of control, occupancy or operation of the premises (hereinafter referred to as "transfer") the Employer shall give the Union two (2) weeks' written notice prior to the effective date thereof; the Employer, be he seller, lessor, transferor, assignor or otherwise, shall, as a condition of the transfer require the transferee to agree in writing to adopt this Agreement and offer employment to all employees of the Employer. Without in any way limiting the other rights and remedies of the Union, anyone failing to adhere to the foregoing provisions shall pay, in addition to such further damages as may be found by the Arbitrator, six (6) months pay for the benefit of the employees as liquidated damages to them.

(b) In the event of a transfer of the building at any time during which a subcontract exists for work covered by this Agreement, the transferor shall require the transferee, as a condition of the transfer, to adopt the provisions of this Agreement with respect to the subcontracted work and become bound by the provisions of Articles I and VII of this Agreement. In the event that any transferee during the period of subcontracting shall fail to become a party to this agreement as aforesaid, the Union, in addition to the other remedies provided herein, upon three (3) days oral or written notice to the Employer, may cancel Article IV of this Agreement, and then engage in any work stoppage, strike or picketing, without thereby causing a termination of any other provisions of this Agreement, until an agreement is concluded.

(c) Upon the expiration date of this Agreement as set forth in Article VIII, Section I, this Agreement shall thereafter continue in full force and effect for an extended period until a successor agreement shall have been executed. During the extended period, all terms and conditions hereof shall be in effect including subject to the provisions of this paragraph, the provisions of this Article VI, Section I (a), (b), and (c). During the extended period, the Employer shall negotiate for a successor agreement retroactive to the expiration date, and all benefits and improvements in such successor agreement shall be so retroactive, if such agreement shall so provide. In the event the parties are unable to agree upon terms of a successor agreement, the Union, upon three (3) days oral or written notice to the Employer, may cancel Article IV of this Agreement, and then engage in any work stoppage, strike or picketing, without thereby causing a termination of any other provisions of this Agreement, until the successor agreement is concluded.

In the event of a transfer during the extended period, the Employer shall comply with Article VI, Section I (a), (b), and (c) of this Agreement and subject to provisions of this Article negotiations shall continue with the transferee Employer; in the event the transferee shall not agree to make benefits or improvements retroactive to the expiration date hereof as set forth in Article VIII, Section I, then, whether or not adjustments have been made therefor at the closing, the Employer shall pay the value or amount of all improvements in benefits, wages and working conditions from the expiration date to the date of closing, in the amount agreed to by such transferee Employer.

2. Nothing herein contained shall be deemed to limit or diminish in any way the Union's right to enforce this agreement against any transferee pursuant to applicable law concerning rules of successorship or otherwise; nor limit or diminish in any way the Union's or any employee's right to institute proceedings pursuant to the provisions of State or Federal labor relations laws, or any statutes, rules or regulations which may be applicable.

3. Any transferee who has failed to adopt this Agreement pursuant to the provisions of Section I of this Article VI by reason of such transferee's lack of knowledge of the requirements thereof may within twenty (20) days after the date of transfer adopt this Agreement provided that, prior to the date of such adoption, there has been no layoff or reduction in force, and that such adoption is retroactive to the date of transfer of title or control.

4. Where a building is acquired by a public authority of any nature through condemnation, purchase or otherwise, the last owner shall guarantee the payment of termination pay and of accrued vacations due to the employees up to the date of transfer of title. The Union will, however, seek to have such authority assume the obligations for payments. If unsuccessful and the last owner becomes liable for such payment, the amounts thereof shall be liens upon any condemnation award or on any amount received by such last owner.

5. This agreement shall be binding and inure to the benefit of all successors, transferees or assignees of the parties.

## ARTICLE VII—Subcontracting

1. The Employer shall not make any agreement or arrangement for the performance of work and/or for the categories of work heretofore performed by employees covered by this Agreement except within the provisions and limitations set forth below.

2. The Employer or contractor shall give advance written notice to the Union at least three (3) weeks prior to the effective date of its contracting for services, or changing contractors, indicating name and address of the contractor. The contractor, within three (3) business days of notice of its cancellation, shall so notify the Union in writing.

3. The Employer shall require the contractor to retain all bargaining unit employees working at the location at the time the contract was awarded and to maintain the existing wage and benefit structure. The Union may reject said contractor where the contractor has not made proper payments to the Health, Pension, Training, Legal and/or SRSP Funds or has habitually failed to comply with labor agreements with the Service Employees International Union (SEIU) covering other buildings in New York City and Nassau and Suffolk Counties and New Jersey in the industry.

The Employer agrees that employees then engaged in the work which is contracted out shall become employees of the initial contractor or any successor contractor, and agrees to employ or re-employ the employees working for the contractor when the contract is terminated or cancelled. This provision shall not be construed to prevent termination of any employee's employment under other provisions of this Agreement relating to illness, retirement, resignation, discharge for cause, or layoff by reason of reduction of force; however, a contractor may not reduce force or change the work schedule without first obtaining written consent from the Union.

With respect to all jobs contracted for by the Employer where members of the Union were employed when the contract was acquired, it is agreed that the Employer shall retain at least the same number of employees, the same employees, under the same work schedule, and assignments including starting and quitting times of each employee.

The Employer shall be liable severally, and jointly with the contractor, for any and all damages sustained by the employees including any unpaid Health, Pension, Training, Legal, and SRSP Fund contributions.

4. This Article and Article VI are intended to be work preservation provisions for the employees employed in a particular building and to categories of employees to the extent that such categories of employees are "fairly claimable" by the Union within existing National Labor Relations Board case law. In the event that the application of this Article or Article VI, or any part thereof, is held to be in violation of law, then this Article or Article VI, or any part thereof, shall remain applicable to the extent permitted by law.

## ARTICLE VIII—Terms of Agreement and Reopenings

1. This agreement shall expire April 20, 2006.

2. There is presently an agreement between the Union and the RAB in the 2003 RAB Apartment Building Agreement which provides that the parties thereto may be required to negotiate additional contributions to the Health, Pension, Training and Legal Funds. The parties hereto agree that any awards, decisions or agreements between the Union and the RAB concerning such increased contributions to the Funds shall be applicable to and binding upon the parties hereto and that the Employer shall pay to the Funds provided under Article X, paragraph 40 of this Agreement, the same payment increases as may be required of Employers generally as a result thereof, and upon the same effective dates required thereunder.

## ARTICLE IX—Building Classifications; Wages and Hours

**A. Building Classifications**

1. (a) Class A buildings are buildings where the assessed value of the land and building, based upon the 1935 assessment, divided by the number of rooms in the building, gives an assessed value of over $4000 a room;

(b) Class B buildings are buildings where the assessed value of the land and building, based upon the 1935 assessment, divided by the number of rooms in the building, gives an assessed value of over $2,000 a room, and not over $4,000 a room;

(c) Class C buildings are buildings where the assessed value of the land and building, based upon the 1935 assessment, divided by the number of rooms in the building, gives an assessed value of $2,000 or less a room;

(d) All non-publicly financed buildings now or in the future, owned cooperatively or in condominium shall be classified Class A and wages shall be increased accordingly.

2. In classifying buildings completed and opened for occupancy after levying of the 1935 assessment, the first year of assessment shall control. Where a building is newly erected or remodeled and open for occupancy after April 21, 1976, and where its proper classification as finally determined indicates that the employees had been paid wages lower than required under said classification, employees shall be paid retroactively all amounts they would have received under proper classification.

3. In calculating the number of rooms, a room shall be considered to be a rentable room enclosed by four walls, with a door and also a window facing a street, court, areaway or airshaft.

4. Bathrooms shall not be counted as rooms except in apartments of three rooms or less, where the bathrooms shall be counted as half-rooms, but this provision shall not cause a revision of existing classifications.

5. Rooms occupied by the superintendent and servants, if above cellar or basement level, shall be included in the total number of rooms.

6. Where stores are on the ground floor, the number of rooms on that floor shall be considered to be the same number, less three, as on a typical floor.

7. When eighty percent (80%) of a building's area and total number of units are changed to commercial and/or professional occupancy, it shall be considered a commercial building no longer covered under this Agreement, but shall be covered under the applicable Commercial Building Agreement.

8. No building service employee may be employed in any building, except within a tenant's apartment, save by the Employer, without the Union's consent.

**B. Wages and Hours**

1. (a) Effective April 21, 2003, each employee covered hereunder shall receive a weekly wage increase of $18.00 (45 cents for each regular straight-time our worked).

Additionally the minimum weekly rate differentials for handypersons including all employees doing similar or comparable work by whatever title known, shall be increased by two dollars ($2.00) per week and each such employee shall receive a wage increase in an amount necessary to bring them up to the new contract minima.

Minimum wages for a standard workweek shall then be:

|  | Class "A" | Class "B" | Class "C" |
|---|---|---|---|
| Handyperson | $747.63 | $745.32 | $743.01 |
| Others | $678.63 | $676.32 | $674.01 |

(b) Effective April 21, 2004, each employee covered by this agreement shall receive a weekly wage increase of $19.00 (47½ cents for each regular straight-time hour worked).

Additionally the minimum weekly rate differentials for handypersons including all employees doing similar or comparable work by whatever title known, shall be increased by two dollars ($2.00) per week and each such employee shall receive a wage increase in an amount necessary to bring them up to the new contract minima.

Minimum wages for a standard workweek shall then be:

|  | Class "A" | Class "B" | Class "C" |
|---|---|---|---|
| Handyperson | $768.63 | $766.32 | $764.01 |
| Others | $697.63 | $695.32 | $693.01 |

(c) Effective April 21, 2005, each employee covered by this agreement shall receive a weekly wage increase of $20.00 (50 cents for each regular straight-time hour worked).

Additionally the minimum weekly rate differentials for handypersons including all employees doing similar or comparable work by whatever title known, shall be increased by two dollars ($2.00) per week and each such employee shall receive a wage increase in an amount necessary to bring them up to the new contract minima.

Minimum wages for a standard workweek shall then be:

|  | Class "A" | Class "B" | Class "C" |
|---|---|---|---|
| Handyperson | $790.63 | $788.32 | $786.01 |
| Others | $717.63 | $715.32 | $713.01 |

(d) The Union and the RAB presently have an agreement in the 2003 Apartment Building Contract which provides that:

(1) Effective April 21, 2004, in the event that the percentage increase in the cost of living (Consumer Price Index for the City of New York–Metropolitan Area (New York–New Jersey) Urban Wage Earners and Clerical Workers) from February, 2003, to February, 2004, exceeds 6-1/2%, then, in that event, an increase of .10 per hour for each full 1% increase in the cost of living in excess of 6-1/2% shall be granted effective for the first full workweek commencing after April 21, 2004. In no event shall said increase pursuant to this provision exceed $.20 per hour. In computing increases in the cost of living above 6-1/2%, less than .5% shall be ignored and increases of .5% or more shall be considered a full point. Any increases hereunder shall be added to the minima.

(2) Effective April 21, 2005, in the event that the percentage increase in the cost of living (Consumer Price Index for the City of New York–Metropolitan Area (New York–New Jersey) Urban Wage Earners and Clerical Workers) from February, 2004, to February, 2005, exceeds 6%, then, in that event, an increase of .10 per hour for each full 1% increase in the cost of living in excess of 6% shall be granted effective for the first full workweek commencing after April 21, 2005. In no event shall said increase pursuant to this provision exceed $.20 per hour. In computing increases in the cost of living above 6%, less than .5% shall be ignored and increases of .5% or more shall be considered a full point. Any increases hereunder shall be added to the minima.

The parties hereto agree that any such increases referred to above which may result shall be fully binding upon the parties hereto in the same amounts and upon the same effective dates as between the Union and the RAB.

2. (a) The standard workweek shall consist of five (5) days of eight (8) hours each but the two days off in such standard workweek need not be consecutive, except as provided in Article JJ, Section 3, hereof.

Overtime at the rate of time and one-half the regular straight-time hourly rate shall be paid for all hours worked in excess of eight (8) hours per day or of forty (40) hours per week, whichever is greater. There shall be no split shifts. A paid holiday shall be considered as a day worked for the purpose of computing overtime pay. The straight-time hourly rate shall be computed by dividing the weekly wage by the number of hours in the standard workweek.

(b) Luncheon recess shall not be less than forty-five (45) minutes or more than one (1) hour and no employee shall be required to take time off in any work day in excess of one hour for lunch recess without having such time charged against the Employer as working time.

(c) Every employee shall be entitled to two (2) days off in each workweek. Any work performed on such days shall be considered overtime and paid for at time and one-half.

(d) No regular full-time employee shall have his regular working hours as set forth above reduced below the standard workweek in order to effect a corresponding reduction in pay. No replacement employee may be hired for less hours than the employee he is replacing.

3. Except for required relief periods and luncheon recess, hours of work in each day shall be continuous and no employee shall be required to take a relief period or time off in any day in excess of the required relief periods and said luncheon recess, without having said excess relief period or time off charged as working time.

4. Any employee called in to work by the Employer for any time not consecutive with his regular schedule shall be paid for at least four (4) hours of overtime.

5. Any employee who spends one full week or more performing work in a higher paying category shall receive the higher rate of pay for such service.

6. Employees required to work overtime shall be paid at least one hour at the overtime rate, except for employees working overtime due to absenteeism or lateness.

7. Any employee who has worked eight (8) hours in one day and is required to work at least four (4) hours of overtime in that day, shall be given a $15.00 meal allowance.

8. No overtime shall be given for disciplinary purposes. An Employer shall not require an employee to work an excessive amount of overtime.

9. The Employer agrees to use its best efforts to provide a minimum of sixteen (16) hours off between shifts for employees.

## ARTICLE X—General Clauses

1. DIFFERENTIALS—Existing wage differentials among classes of workers within a building shall be maintained. It is recognized that differentials other than those herein required may arise or exist because of wages above the minimum required by this Agreement. No change in such differentials shall be considered a violation of this Agreement unless it appears that it results from an attempt to break down the wage structure for the building. Where an obvious inequity exists because of an employee's regular application of specialized abilities in his work, the amount or correctness of the differential may be determined by arbitration.

Notwithstanding the above, it is understood that licensed engineers covered under this Agreement shall receive the same wages and benefits as paid to engineers under the Realty Advisory Board Agreement covering licensed engineers in New York City except the pension, health, legal and training fund contributions shall continue to be paid under the terms of this Agreement.

2. PYRAMIDING—There shall be no pyramiding of overtime pay, sick pay, holiday pay or any other premium pay. If more than one of the aforesaid are applicable, compensation shall be computed on the basis of the greatest amount.

3. HOLIDAYS—The following are the recognized contract holidays:

| Holiday | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| New Years Day | | Thursday January 1 | Tuesday January 1 | Wednesday January 1 |
| Martin Luther King Day | | Monday January 19 | Monday January 17 | Monday January 16 |
| President's Day | | Monday February 16 | Monday February 21 | Monday February 20 |
| Memorial Day | Monday May 26 | Monday May 31 | Monday May 30 | |
| Independence Day | Friday July 4 | Sunday July 4 | Monday July 4 | |
| Labor Day | Monday September 1 | Monday September 6 | Monday September 5 | |
| Columbus Day | Monday October 13 | Monday October 11 | Monday October 10 | |
| Election Day | Tuesday November 4 | Tuesday November 2 | Tuesday November 8 | |
| Thanksgiving Day | Thursday November 27 | Thursday November 25 | Thursday November 24 | |
| Christmas Day | Thursday December 25 | Saturday December 25 | Sunday December 25 | |

Elective Holiday: Select one of the following or a personal day at the option of the employee.

| | | | | |
|---|---|---|---|---|
| Lincoln's Birthday | | Thursday February 12 | Saturday February 12 | Sunday February 12 |
| Good Friday | | Friday April 9 | Friday March 25 | Friday April 14 |
| Yom Kippur | Monday October 6 | Thursday September 25 | Monday September 13 | |
| Eid al-Fitr | Wednesday November 26 | Sunday November 14 | Thursday November 3 | |

In the event the employee selects a personal day in accordance with the above schedule it shall be granted according to the following provision:

Employees entitled to a personal day may select such day off on five (5) days notice to the Employer provided such selection does not result in a reduction of employees in the building below 75% of the normal work staff. Such selection shall be made in accordance with seniority.

The Employer shall post a holiday schedule on the bulletin board and it shall remain posted throughout the year.

Employees shall receive their straight-time pay for said holidays and in addition thereto all work required to be performed on any of said holidays shall be paid for at time and one-half as such. Any employee required to work on a holiday shall receive at least eight (8) hours pay for such work at the holiday rate of pay (in addition to the eight (8) hours pay he receives for such holiday as such) even though he is not required to work eight (8) hours. All hours worked over eight (8) hours on such a holiday shall be paid for at two and one-half times his regular rate of pay.

Any regular full-time employee ill in any payroll week in which a holiday falls shall receive holiday pay or one day off if he worked at least one day during said payroll week.

Any regular full-time employee whose regular day off, or one of whose regular days off falls on a holiday, shall receive an additional day's pay, or at the option of the Employer, shall receive an extra day off within ten (10) days immediately before or after the holiday. If the employee receives the extra day off before the holiday and his employment is terminated for any reason, he need not compensate the Employer for that day.

4. PERSONAL DAY—All employees shall receive a personal day in each contract year. This personal day is in addition to the holidays listed in paragraph 3 above. The personal day shall be scheduled in accordance with the following provision:

Employees may select such day off on five (5) days notice to the Employer provided such selection does not result in a reduction of employees in the building below 75% of the normal work staff. Such selection shall be made in accordance with seniority.

5. VOTING TIME—Election Day is a recognized holiday and any employee required to work on Election Day, and who gives legal notice, shall be allowed two (2) hours off, such hours to be designated by the Employer, while the polls are open. Said two (2) hours shall be included in the eight (8) hour day for which such employee receives his regular straight-time idle pay, but shall not be considered hours actually worked for the purpose of premium pay.

6. SCHEDULES—Overtime, Sunday and holiday work shall be evenly distributed so far as is compatible with efficient building operation, except where Sunday is a regular part of the workweek.

7. RELIEF EMPLOYEES—Relief or part-time employees shall be paid the same hourly rate as full-time employees in the same occupational classification.

8. METHOD OF PAYMENT OF WAGES—All wages, including overtime, shall be paid weekly in cash or by check with an itemized statement of payroll deductions. If a regular pay day falls on a holiday, employees shall be paid on the preceding day.

Employees paid by check who work during regular banking hours shall be given reasonable time to cash their checks exclusive of their break and lunch period. The Employer shall make suitable arrangements at a convenient bank for such check cashing.

In the event an Employer's check to an employee for wages is returned due to insufficient funds on a bona fide basis twice within a year's period, the Employer shall be required to pay all employees by cash or certified check.

The Employer may require, at no cost to the employee, than an employee's check be electronically deposited at the employee's designated bank. The Union shall be notified by the Employer of this arrangement.

9. LEAVE OF ABSENCE AND PREGNANCY LEAVE—(a) Once during the term of this Agreement, upon written application to the Employer and the Union, a regular employee who has been employed in the building for five (5) years or more shall be granted a leave of absence for illness or injury not to exceed six (6) months.

Employees with less than five (5) years but at least two (2) years shall be granted a leave of absence for a period not to exceed sixty (60) days.

In buildings where there are more than four (4) employees, an employee shall be entitled to a two week leave of absence without pay for paternity/maternity ..ve. The leave must be taken immediately following the birth or adoption of the child.

(b) In cases of pregnancy, it shall be treated as any other disability suffered by an employee in accordance with applicable law.

The leaves of absence outlined above are subject to an extension not exceeding six (6) months in the case of a bona fide inability to work whether or not covered by the New York State Workers' Compensation Law or New York State Disability Benefits Law. When such employee is physically and mentally able to resume work, that employee shall on one (1) week's prior notice to the Employer be then reemployed with no seniority loss.

In cases involving on-the-job injuries, employees who are on medical leave for more than one year may be entitled to return to the jobs if there is good cause shown.

Once in every five (5) years, upon six (6) weeks written application to the Employer, a regular employee who has been employed at the building for five (5) years or more shall be granted a leave of absence for personal reasons not to exceed four (4) months. Upon his return to work he shall be reemployed with no loss of seniority.

Any employee requesting a personal leave of absence shall be covered for health benefits during the period of the leave, provided the employee requests health coverage while on leave of absence and pays the Employer in advance for the cost of same.

Any employee on leave due to workers' compensation or disability shall continue to be covered for health benefits without the necessity of payment to the Employer in accordance with General Clause 40, Paragraph A Sub-paragraph 1.

Any time limitation with regard to the six (6) weeks written application shall be waived in cases where an emergency leave of absence is required.

Any Employer who is required by law to comply with the provisions of the Family and Medical Leave Act (FMLA) shall comply with the requirements of said act.

10. VACATIONS and VACATION RELIEF EMPLOYEES— (a) Every employee employed with substantial continuity in any building or by the same Employer shall receive each year a vacation with pay as follows:

| | | | |
|---|---|---|---|
| Employees who have worked 6 months . . . . . . . . . . 3 working days | | Employees who have worked 21 years . . . . . . . . . . . . . 21 working days | |
| Employees who have worked 1 year . . . . . . . . . . . . . . 2 weeks | | Employees who have worked 22 years . . . . . . . . . . . . . 22 working days | |
| Employees who have worked 5 years . . . . . . . . . . . . . 3 weeks | | Employees who have worked 23 years . . . . . . . . . . . . . 23 working days | |
| Employees who have worked 15 years . . . . . . . . . . . . 4 weeks | | Employees who have worked 24 years . . . . . . . . . . . . . 24 working days | |
| | | Employees who have worked 25 years . . . . . . . . . . . . . 5 weeks | |

Length of employment for vacation shall be based upon the amount of vacation that an employee would be entitled to on September 15th of the year in which the vacation is given, subject to negotiation and arbitration where the result is unreasonable.

Part-time employees regularly employed shall receive proportionate vacation allowances based on the average number of hours per week they are employed.

Firemen who have worked substantially one (1) firing season in the same building or by the same Employer, when laid off, shall be paid at least three (3) ..ys' wages in lieu of vacation.

Firemen who have been employed more than one (1) firing season in the same building or by the same Employer shall be considered as full-time employees in computing vacations.

Regular days off and holidays falling during the vacation period shall not be counted as vacation days. If a holiday falls during the employee's vacation period, he shall receive an additional day's pay therefore, or at the Employer's option, an extra day off within ten (10) days immediately preceding or succeeding his vacation.

Vacation wages shall be paid prior to the vacation period unless otherwise requested by the employee, who is entitled to actual vacation time and cannot instead be required to accept money.

Any Employer who fails to pay vacation pay in accordance with this provision where the vacation has been regularly scheduled shall pay an additional two (2) days pay for each vacation week due at that time.

Employees regularly working overtime shall not suffer any reduction in wages while being paid or scheduled for vacation time.

When compatible with proper building operation, choice of vacation periods shall be according to seniority, and confined to the period beginning May 1st and ending September 15th of each year. These dates may be changed, and the third vacation week taken at a separate time by mutual consent of the Employer and employee.

The fourth and fifth week of vacation may, at the Employer's option, be scheduled upon two (2) weeks' notice to the employee, for a week or two weeks (which may not be split) other than the period when he takes the rest of his vacation.

Any employee, leaving his job for any reason, shall be entitled to a vacation accrual allowance, computed on his length of service as provided in the vacation schedule based on the elapsed period from the previous September 16th (or from the date of his employment if later employed) to the date of his leaving. Any employee who has received a vacation during the previous vacation period (May 1st through September 15th) and who leaves his job during the next vacation period shall be entitled to full vacation accrual allowances instead of on the basis of the elapsed time period from the previous September 16th.

No employee leaving his job of his own accord shall be entitled to accrued vacation pay unless he gives five (5) working days' termination notice. Any employee who has received no vacation and has worked at least six (6) months before leaving his job shall be entitled to vacation accrual allowance equal to the vacation allowances provided above.

The Employer shall be responsible for payment of vacation pay required under this Agreement regardless of vacation credits which may have accrued prior to the Employer taking over the building. In the event that the Employer terminates its Employer-employee relationship under this agreement and the successor Employer does not have an agreement with the Union providing for at least the same vacation benefits, the Employer shall be responsible for all accrued vacation benefits.

(b) A person hired solely for the purpose of relieving employees for vacation shall be paid 60% of the minimum applicable regular hourly wage rate. Should vacation relief employee continue to be employed beyond five months, such employee shall be paid the wage rate of a new hire or experienced person, as the case may be. If a vacation replacement is hired for a permanent position immediately after working as a vacation replacement, such employee shall be credited with time worked as a vacation replacement toward completion of the 30-month period required to achieve the full rate of pay under the "New Hires" provision.

In the event that the Arbitrator finds that an Employer is using this rate as a subterfuge, such Arbitrator may, among other remedies, award full pay from the date of employment at the applicable hiring rate.

No contribution to any Benefit Funds shall be made for a vacation relief person.

Page 7

11. DAYS OF REST—Each employee shall receive at least one (1) day of rest every seven (7) days.

12. UNIFORMS AND OTHER APPAREL—Uniforms and work clothes, where they have been required by the Employer or where necessary on the job, shall be supplied and maintained by the Employer. All uniforms shall be appropriate for the season. Where the Employer does not require uniforms, the employees shall be free to wear suitable clothing of their choice.

Employees doing outside work shall be furnished adequate wearing apparel for the purpose.

In buildings of 500,000 square feet or more, the Employer shall be required to furnish uniforms and work clothes.

13. FIRST AID KIT—An adequate and complete first aid kit shall be supplied and maintained by the Employer in a place readily available to all employees.

14. FIRE AND FLOOD—Employees shall be reimbursed for loss of personal property caused by fire or flood in the building.

15. EYEGLASSES AND UNION INSIGNIA—Employees may wear eyeglasses and the Union insignia while on duty.

16. BULLETIN BOARD—A bulletin board shall be furnished by the Employer exclusively for Union announcements and notices of meetings.

17. SANITARY ARRANGEMENTS—Adequate sanitary arrangements shall be maintained in every building and, individual locker and key thereto and rest room key, where rest room is provided, and soap, towels and washing facilities shall be furnished by the Employer for all employees. The rest room and locker room shall be for the sole use of employees servicing and maintaining the building.

18. REPLACEMENTS, PROMOTIONS, VACANCIES, TRIAL PERIOD, SENIORITY and NEWLY HIRED EMPLOYEES— (a) In filling vacancies or newly created positions in the bargaining unit, preference shall be given to those employees already employed in the building based upon the employee's seniority, but training, ability, efficiency, appearance and personality for a particular job, shall also be considered.

If a present employee cannot fill the job vacancy, the Employer must fill the vacancy in accordance with the other terms of this collective bargaining agreement.

In the event that a new classification is created in a building, the Employer shall negotiate with the Union a wage rate for the classification.

There shall be a trial period for all newly hired employees for sixty (60) days except as provided for Superintendents in Article X, paragraph 43.

Anyone employed as an "extra" or a contingent with substantial regularity for a period of four (4) months or more shall receive preference in steady employment, other considerations being equal.

In case of layoffs due to reduction of force, departmental seniority shall be followed, except as provided in Article X, paragraph 20(c) below, with due consideration for the efficiency and special needs of the department.

In filling vacancies or newly created positions the wages shall be those prevailing and in force in the building for similar work, excluding extra pay attributable to years of service or special consideration beyond the requirements of the job which the replacement is not qualified to meet.

If there is no similar work in the building the new employee shall receive a fair starting wage.

The seniority date for all positions under the Agreement shall be the date the employee commenced working in the building for the agent and/or owner regardless of whether there is a collective bargaining agreement and regardless of the type of work performed by the employee.

(b) A New Hire employed in the "other" category shall be paid a starting rate of eighty percent (80%) of the minimum wage rate. A New Hire employed as a "superintendent" in a building with five (5) or fewer employees may be paid a starting rate of eighty percent (80%) of the applicable contract rate.

Upon completion of 30 months of employment, the new hire shall be paid the full minimum wage rate.

This provision shall not apply to any experienced employee ("Experienced Employee") who was employed in the New York City Building Service Industry ("Industry") as of April 20, 2000. Experienced employee shall be defined as a person who has worked in the Industry for a period of at least thirty (30) days within the twenty-four (24) months immediately preceding hiring (excluding employment as a vacation relief).

No experienced employee may be terminated or denied employment for the purpose of discrimination on the basis of his/her compensation and/or benefits.

The Union may grieve such discrimination in accordance with the grievance and arbitration provisions of the Agreement (Article V).

If the arbitrator determines an experienced employee has been terminated or denied employment because of such discrimination, the arbitrator shall:

(1) In case of termination—reinstate the experienced employee with full back pay and all benefits retroactive to the date of experienced employee's discharge.

(2) In case of failure to hire—If the Arbitrator determines that an experienced employee was not given preference for employment absent good cause, he or she shall direct the Employer to hire the experienced employee with full back pay and benefits retroactive to date of denial of hire.

No contribution shall be made to the Building Service Pension Fund or to the SRSP Fund on behalf of a new hire until the new hire has completed two (2) years of employment. Contributions shall be made for an experienced employee in accordance with the other provisions of this Agreement.

19. REDUCING FORCE, RECALL, JOB VACANCY AND AGENCY FEE—(a) If the Employer contemplates reducing force, he is required to give the employee(s) and the Union four (4) weeks' advance written notice of layoff or discharge; provided, however, that where an employee occupies living space in the building, the Employer shall give the employee thirty (30) days' written notice. The Employer must receive written consent from the Union before any reduction in force is put into effect.

(b) Any employee who has been employed for one (1) year or more with the same agent, owner, Employer or contractor, or in the same building, and who is laid off, shall have the right of recall, provided that the period of lay-off of such employee does not exceed six (6) months. Recall shall be in order of laid off employee's seniority, i.e., the most recently terminated employee shall have the first right of recall.

The Employer shall notify by certified mail, return receipt requested, the last qualified laid off employee at his last known address, of any job vacancy and a copy of this notice shall be sent to the Union. The employee shall then be given seven (7) days from the date of mailing of the letter in which to express in person or by registered or certified mail his desire to accept the available job. In the event any employee does not accept recall, successive notice shall be sent to qualified employees until the list of qualified employees is exhausted. Upon re-employment, full seniority status for purpose of lay-off shall be credited to the employee. Any employee who received termination pay and is subsequently rehired shall retain said termination pay and for purpose of future termination pay shall receive the difference between what he has received and what he is entitled to if subsequently terminated at a future date.

Further, in the event an Employer or agent has a job vacancy in a building where there are no qualified employees on lay-off status, the Employer or agent shall use its best efforts to fill the job vacancy from qualified employees of the Employer or agent who are on lay-off status from other buildings.

(c) Upon the occurrence of any job vacancy not filled by current employees of the Employer, or employees recalled pursuant to other provisions of this Agreement, the Employer shall notify the Union and the New York State Employment Bureau (NYSEB) two (2) weeks prior to the existence of a vacancy. Such notice shall be confirmed in writing. In the event the Employer does not have two (2) weeks' notice, it shall notify the Union and the NYSEB upon notice of the vacancy. The NYSEB or the Union shall refer qualified applicants to such a vacancy within three (3) working days of the request, or shorter periods in case of emergencies. If the NYSEB or the Union is unable to refer qualified applicants satisfactory to the Employer within three (3) working days, or such shorter period required by an emergency, the Employer shall be free to hire in the open market.

(d) In the event the Union establishes a hiring hall during the life of this Agreement, any procedures established between the RAB and the Union shall apply to the parties hereto. No employee shall be employed through a fee charging agency unless the Employer pays the full fee.

20. TERMINATION PAY—(a) In case of termination of employment because of the employee's (excluding a working Superintendent) physical or mental inability to perform his duties, he shall receive in addition to accrued vacation, termination pay according to service in the building or with the same owner, whichever is greater as follows:

| Pay: | | | |
|---|---|---|---|
| Employees with | | 15 but less than 17 years | 6 weeks' wages |
| 5 but less than 10 years | 1 week's wages | 17 but less than 20 years | 7 weeks' wages |
| 10 but less than 12 years | 2 weeks' wages | 20 but less than 25 years | 8 weeks' wages |
| 12 but less than 15 years | 3 weeks' wages | 25 years or more | 10 weeks' wages |

An employee physically or mentally unable to perform his duties may resign and receive the above termination pay if he submits written certification from a physician of such inability at the time of termination. In such event, the Employer may require the employee (a) to submit a medical examination at the Health Center at no cost to the Employer to determine if in fact the employee is physically or mentally unable to perform his duties, which determination shall be final and binding, or (b) to submit at the Employer's expense to a medical examination by a physician designated by the Employer to determine if in fact the employee is physically or mentally unable to perform his duties. If the Employer's designated physician disagrees with the physician's certification submitted by the employee, the employee shall be examined by a physician designated by the Medical Director of the Building Service Health Fund to make a final and binding determination whether the employee is physically and mentally unable to perform his duties.

(b) In case of termination of employment for any reason other than just cause or in accordance with paragraph (a) above, the employee shall receive, in addition to his accrued vacation, termination pay according to years of service in the building or with the same owner, whichever is greater, as follows:

| | | | |
|---|---|---|---|
| 0–5 years | 1 week's wages | 17 but less than 20 years | 8 weeks' wages |
| 5 but less than 10 years | 2 weeks' wages | 20 but less than 22 years | 9 weeks' wages |
| 10 but less than 12 years | 4 weeks' wages | 22 but less than 25 years | 10 weeks' wages |
| 12 but less than 15 years | 5 weeks' wages | 25 years or more | 11 weeks' wages |
| 15 but less than 17 years | 7 weeks' wages | | |

(c) The right to accept termination pay and resign where there has been a reduction in force be determined by seniority, and notice of an intended layoff shall be posted in the building. If no senior employee wishes to exercise his rights under this provision, the least senior employee or employees shall be terminated and shall receive any applicable termination pay.

(d) "Week's pay" in the above paragraph means the regular straight-time weekly pay at the time of termination. If the Employer offers part-time employment to the employee entitled to termination pay, he shall be entitled to termination pay for the period of his full-time employment, and if he accepts such part-time employment, he shall be considered a new employee for all purposes. Where an employee was placed on a part-time basis or suffered a pay reduction because of a change in his work category prior to May 21, 1967, and did not receive termination pay based upon his former pay, "week's pay" shall be determined by agreement, or through grievance and arbitration.

(e) Any employee accepting termination pay who is re-hired in the same building or with the same Employer shall be considered a new employee for all purposes except as provided in the Recall clause.

(f) For the purposes of this section, sale or transfer of a building shall not be considered a termination of employment so long as the employee or employees are hired by the purchaser or transferee, in which case they shall retain their building seniority for all purposes.

21. TOOLS, PERMITS, FINES, & LEGAL ASSISTANCE—All tools, of which the Superintendent shall keep an accurate inventory, shall be supplied by the Employer. The Employer shall continue to maintain and replace any special tools or tools damaged during ordinary performance of work but shall not be obligated to replace "regular" tools if lost or stolen. The Employer shall bear the expense of securing or renewing permits, licenses or certificates for specific equipment located on the Employer's premises, and who will pay fines and employees' applicable wages for required time spent for the violation of any codes, ordinances, administrative regulations or statutes, except any resulting from the employees' gross negligence or willful disobedience.

The Employer shall supply legal assistance where required to employees who are served with summons regarding building violations.

22. MILITARY SERVICE—All statutes and valid regulations about reinstatement and employment of veterans shall be observed.

The Employer and the Union will cooperate to achieve the objectives of this provision. They shall also consider the institution of plans to provide training of employees to improve their skills and enter into employment in the industry.

23. NO DISCRIMINATION—There shall be no discrimination against any present or future employee by reason of race, creed, color, age, disability of an individual in accordance with applicable law, national origin, sex, union membership, or any characteristic protected by law. Any disputes under this provision shall be subject to the grievance and arbitration procedure (Article V).

24. EMPLOYEES' ROOM AND UTILITIES—Any employee occupying a room or apartment on the Employer's property, may be charged a reasonable rental therefore. If such an occupancy is a condition of his employment, the premises shall be adequate and properly maintained by the Employer, no rent shall be charged and the Employer shall provide normal gas and electric service and pay business telephone bills.

The value of the apartment and services provided therewith such as gas, electric and business phone, shall not be treated as or included for any purpose in the wage, remuneration or other income of such employee to the extent permitted by law.

If the Employer terminates the service of an employee occupying living space in the building he shall give him thirty (30) days' written notice, except where there is a discharge for a serious breach of the employment contract.

The Employer's notice to the employee to vacate his apartment shall be considered held in abeyance and the effective date thereof considered postponed, if necessary, until the matter is adjusted or determined through grievance or arbitration.

25. DEFINITIONS—A handyperson differs from an elevator operator, porter, hall person, etc., because by training and experience, he or she possesses a certain amount of mechanical or technical skill and devotes more than fifty (50) percent of working time in a building to work involving such skill.

A guard is an employee whose function is to enforce rules to protect the property of the Employer or to protect the safety of persons on the Employer's premises and whose duties shall not include the work performed under any other classification covered by this Agreement.

Page 9

Others include elevator operators, guards, doorpersons, porters, porter/watchpersons, watchpersons, security porters, security employees, fire safety directors, exterminators and all other service employees employed in the building under the jurisdiction of the Union except Superintendents and handypersons.

All references to the male gender shall be deemed to include the female gender.

26. REQUIRED TRAINING PROGRAMS—The Employer shall compensate any employee now employed in a building for any time required for the employee to attend any instructions or training program in connection with the securing of any license, permit or certificate required by the Employer for the performance of duties in the building. Time spent shall be considered as time worked for the purpose of computing overtime pay.

27. GARNISHMENTS—No employee shall be discharged or laid off because of the service of an income execution, unless in accordance with applicable law.

28. DEATH IN THE FAMILY—A regular, full or part-time employee with at least one (1) year of employment in the building shall not be required to work for a maximum of three (3) days immediately following the death of his parent, brother, sister, spouse or child, and shall be paid his regular, straight-time wages for any such three (3) days on which he was regularly scheduled to work or entitled to holiday pay.

With respect to grandparents, the Employer shall grant a paid day off on the day of the funeral if such day is a regularly scheduled work day.

29. UNION VISITATION—Any business agent or other duly authorized representative of the Union shall have access to the buildings or sites where union members are employed to determine whether the terms of this agreement are being complied with.

30. JURY DUTY—Employees who are required to qualify or serve on juries shall receive the difference between their regular rate of pay and the amount they receive for qualifying or serving on said jury with a maximum of two (2) weeks in any calendar year.

Pending receipt of the jury duty pay, the Employer shall pay the employee his regular pay on his scheduled pay day. As soon as the employee receives his jury duty pay, he shall reimburse his Employer by signing the jury duty paycheck over to the Employer.

Employees who serve on a jury shall not be required to work any shift during such day. If an employee is a weekend employee and assigned to jury duty, he shall not be required to work the weekend.

In order to receive jury duty pay, the employee must notify the Employer at least two (2) weeks before he is scheduled to serve.

If less notice is given by the employee, the notice provision regarding change in shift shall not apply.

31. IDENTIFICATION—Employees may be required to carry with them and exhibit proof of employment on the premises. Such proof shall be that decided upon by the RAB-Local 32BJ committee established in the 2000 Apartment Building Agreement.

32. SERVICE CENTER VISIT—Every regular full-time employee who has been employed in the building for one (1) year or more shall be entitled, upon one (1) week's notice to his Employer, to take one (1) day off in each calendar year at straight-time pay to visit the office of any one of the benefit funds for the purpose of conducting business at the benefit office.

Such employee shall receive an additional one (1) day off with pay to visit the benefit fund office if the office requires such a visit.

In the event that an employee chooses to visit any one of the benefit fund offices after having used up his entitlement pursuant to the above two paragraphs, he may use any of his sick days for that purpose.

33. DEATH OF EMPLOYEE—If an employee dies after becoming entitled to, but before receiving any wage or pay hereunder, it shall be paid to his estate, or pursuant to Section 1310 of the New York Surrogate's Court Procedure Act, unless otherwise provided herein. This shall not apply to any benefits under paragraph 40 of this Article, where the rules and regulations of the Health, Pension, Legal, Training and SRSP Funds shall govern.

34. GOVERNMENTAL DECREE—There is presently in effect an agreement between the Union and the RAB covering apartment buildings in the City of New York which provides that if because of legislation, government decree or order, any increase or benefit is in any way blocked, frustrated, impeded or diminished, the Union may upon ten (10) days' notice require negotiation with the RAB to take such measures and reach such revisions in the contract as may legally provide substitute benefits and improvements for the employees at no greater cost to the Employer. The parties hereto agree that any terms or provisions which may be negotiated between the Union and the RAB as a result of any such re-negotiation shall be fully binding upon the parties hereto upon the same terms and effective date(s) as between the Union and the RAB.

In the event that any provision of this contract requires approval of any government agency, the Employer shall cooperate with the Union with respect thereto.

35. DISABILITY BENEFITS LAW/UNEMPLOYMENT INSURANCE LAW—

(a) The Employer shall cover its employees so that they will receive maximum weekly cash benefits provided under the New York State Disability Benefits Law on a noncontributory basis, and also under the New York State Unemployment Insurance Law, whether or not such coverages are mandatory.

(b) Failure to cover employees makes the Employer liable to an employee for all loss of benefits and insurance.

(c) The Employer will cooperate with employees in processing their claims and shall supply all necessary forms, properly addressed, and shall post adequate notice of places for filing claims.

(d) If the employee informs the Employer he is requesting workers' compensation benefits then no sick leave shall be paid to such employee unless he specifically requests in writing payment of such leave. If any employee informs the Employer he is requesting disability benefits then only five (5) days sick leave shall be paid to such employee (if he has that amount unused) unless he specifically requests in writing payment of additional available sick leave.

(e) Any employee required to attend his workers' compensation hearing shall be paid for his regularly scheduled hours during such attendance.

(f) Any cost incurred by the Union to enforce the provisions of this article shall be borne by the Employer.

(g) There is presently an Agreement between the Union and the RAB which contains provision for the establishment of a committee under the auspices of the Building Service Health Fund to investigate and report on the feasibility of self-insuring disability and unemployment benefits. It is understood and agreed that any awards, decisions or agreements concluded with respect thereto, between the Union and the RAB shall become binding upon the parties hereto upon the same terms and effective dates.

36. SICKNESS BENEFITS—

(a) Any regular employee with at least one (1) year of service (as defined in Section b below) in the building or with the same Employer, shall receive in a calendar year from the Employer ten (10) paid sick days for bona fide illness.

Any employee entitled to sickness benefits shall be allowed four (4) single days of paid sick leave per year taken in single days. The remaining six (6)

days of paid sick leave may be paid either for illness of more than one (1) day's duration or may be counted as unused sick leave days.

The employee shall receive the above sick pay whether or not such illness is covered by New York State Disability Benefits Law or the New York State Workers' Compensation Act; however, there shall be no pyramiding or duplication of Disability benefits and/or Workers' Compensation Benefits with sick pay.

(b) An employee absent from duty due to illness only a scheduled workday immediately before and/or only on the scheduled workday immediately after a holiday shall not be eligible for sick day for said absent workday or workdays.

(c) Employees who have continued employment to the end of the calendar year and have not used all sickness benefits shall be paid in the succeeding January one (1) full day's pay for each unused sick day.

Any employee who has a perfect attendance record for the calendar year shall receive an attendance bonus of $200.00 in addition to payment of the unused sick days.

For the purpose of that provision—perfect attendance shall mean that the employee has not used any sick days.

If an Employer fails to pay an employee before the end of February, then such Employer shall pay one (1) additional day's pay unless the Employer challenges the entitlement or amount due.

(d) For the purpose of this Article one (1) year's employment shall be reached on the anniversary date of employment. Employees who complete one (1) year of service after January 1, shall receive a pro rata share of sickness benefits for the balance of the calendar year.

A "regular" employee shall be defined as one who is a full or part-time employee employed on a regular schedule. Those employed less than forty (40) hours a week on a regular basis shall receive a pro rata portion of sickness benefits provided herein computed on a forty (40) hour workweek.

(e) All payments set forth in this Article are voluntarily assumed by the Employer, in consideration of concessions made by the Union with respect to various other provisions of this Agreement, and any such payment shall be deemed to be a voluntary contribution or aid within the meaning of any applicable statutory provisions.

37. COMMON DISASTER—There shall be no loss of pay as a result of any Act of God or common disaster causing the shutdown of all or virtually all public transportation in the City of New York, making it impossible for employees to report for work, or where the Mayor of the City of New York or the Governor of the State of New York directs the citizens of the City not to report for work. The Employer shall not be liable for loss of pay of more than the first full day affected by such Act of God or common disaster. Employees necessary to maintain the safety or security of the building shall be paid only if they have no reasonable way to report to work and employees refusing the Employer's offer of alternate transportation shall not qualify for such pay. The term "public transportation" as used herein shall include subways and buses.

38. RENT COLLECTION—No employee as part of his usual and regular duties shall be required to collect rent.

39. LIE DETECTOR—The Employer shall not require, request or suggest than an employee or applicant for employment take a polygraph or any other form of lie detector test.

40. HEALTH, PENSION, TRAINING, LEGAL AND ANNUITY FUNDS—

**A. Health Fund**

1. The Employer agrees to make payments into a health trust fund, known as the "Building Service 32B-J Health Fund" to cover employees covered by this Agreement who work more than two (2) days in each workweek, including such employees of other Employers in or connected with the industry for whom contributions are paid, with health benefits under such provisions, rules and regulations as may be determined by the Trustees of the Fund, as provided in the Agreement and Declaration of Trust; provided, however, that the Employer may, by making the required payments in the Fund, cover such other of his employees as he may elect, and provided such coverage is in compliance with law and the Trust Agreement.

Employees who are on workers' compensation or who are receiving disability benefits shall be covered by the Health Fund until they may be covered by Medicare or thirty (30) months from the date of disability, whichever is earlier.

In no event shall any employee who was previously covered for health benefits lose such coverage as a result of the change in this provision and the Employer shall be obligated to make payments for such employees.

2. The Employer shall continue to contribute to the Fund $6214.64 per year for each employee, payable when and how the Trustees determine, to cover employees and their dependent families with health benefits as agreed by the collective bargaining parties, and under such provisions, rules and regulations as may be determined by the Trustees.

Effective January 1, 2004, the rate of contribution to the Fund shall be increased to $6734.64.

3. Any Employer who has a plan in effect prior to the effective date of this Agreement which provides health benefits the equivalent of, or better than, the benefits provided for herein, and the cost of which to the Employer is at least as great, may cover his employees under his existing plan or under the Fund. If the Trustees decide the existing plan does not provide equivalent benefits, but does provide health benefits superior to one or more types of health benefits under this Fund, the Employer may participate in the Fund wholly, or partially for hospitalization and/or surgical coverage and make his payments to the Fund in the amount determined by the Trustees uniformly for all similarly participating Employers.

**B. Pension Fund**

1. The Building Service 32B-J Pension Fund shall continue in force and effect in accordance with its provisions, which include the power of its trustees to revise the amounts of the pension benefits and the conditions under which benefits will be paid and to continue to cover such employees of other Employers in or connected with the industry for whom contributions are paid, provided such coverage is in compliance with law and the Trust Agreement.

Employees unable to work and who are on disability benefits or workers' compensation shall continue to accrue pension benefits during the periods of disability up to six (6) months or the period of the disability, whichever is sooner.

2. The Employer shall continue to contribute the sum of $42.15 per week for every regular employee as defined in the Building Service Pension Plan, as it may be amended.

3. Effective January 1, 2004, the Pension contribution shall be $43.75 per week for every regular employee as defined in the Building Service Pension Plan, as it may be amended.

4. If the Employer has in effect a pension and retirement plan which has been determined by the Trustees to provide benefits equivalent or superior to those provided under the Building Service 32B-J Pension Plan, it may continue the plan provided it continues to provide retirement benefits equivalent or superior to the benefits that are provided under the Building Service 32B-J Pension Plan during the term of this Agreement, and it shall be relieved of any obligation to make payments into the Fund.

**ARTICLE X continued**
**PARAGRAPH 43—Working Superintendent**

SECTION 1
Wages, Days Off and Conditions

1. (a) Effective April 21, 2003, Superintendents covered by this Agreement shall receive twenty-one dollars ($21.00) weekly wage increase and the minimum wage weekly shall then be $ _810.90_

(b) Effective April 21, 2004, Superintendents covered hereunder shall receive a weekly wage increase of twenty-one dollars ($21.00).

(c) Effective April 21, 2005, Superintendents covered hereunder shall receive a weekly wage increase of twenty-three dollars ($23.00)

(d) Cost of living increases, if any, granted to employees under Article IX of this agreement shall be granted to the Superintendent in the same amounts and on the same effective date.

2. (a) The standard workweek shall consist of five days (forty hours). The Employer may reschedule the Superintendent's days off, either consecutively or non-consecutively, provided, however, that the Employer must give the Superintendent at least one (1) week's notice of any change in his scheduled days off.

(b) In all other respects, the building's present practices as to the Superintendent's duties shall continue and as heretofore he shall take care of emergencies. A Superintendent who is required by the Employer to perform other than emergency work on his days off shall receive by mutual agreement of the Employer and the Superintendent, equivalent time off during the same workweek or a day's pay at the time and one-half rate. Nothing herein shall be construed to affect any rights a Superintendent may have under the Fair Labor Standards Act.

(c) The Superintendent shall not be required to renew cables or elevators or build block or hollow tile walls or to do work in conflict with the law.

(d) Where an obvious inequity exists by reason of a Superintendent's regular application of highly specialized abilities in his work, or where his work imposes special or additional responsibilities, the Union may question the amount of his wage once during the term of this agreement through grievance and arbitration.

(e) The Superintendent shall continue to occupy the same or a better apartment. In the event the present Superintendent is replaced, the new Superintendent shall receive the same wages, terms, benefits, and conditions and shall occupy the same or better apartment.

SECTION II—Job Security and Severance Pay

1. If the Employer terminates the Superintendent for reasons other than those set forth in Section 4 below, he shall give him thirty (30) days written notice by registered mail or personal service to vacate the apartment he occupies in the building. If the Superintendent does not contest his discharge, he shall receive an additional thirty (30) days to vacate his apartment. If he is required to do any work during this notice period, he shall be paid his regular rate of pay.

If the Superintendent voluntarily vacates said apartment within said thirty (30) days after receiving said notice, sixty (60) days if discharge is not contested, he shall receive severance pay on the following basis, according to his length of service.

| | | | |
|---|---|---|---|
| Less than 6 months . . . . . . . . . . . . . . . . . .$750 moving expense | | 5 years but less than 6 years . . . . . . . . . . . . . . . . . .8 weeks' pay |
| 6 months but less than 2 years . . . . . . . . . . . . . .4 weeks' pay | | 6 years but less than 7 years . . . . . . . . . . . . . . . .9 weeks' pay |
| 2 years but less than 3 years . . . . . . . . . . . . . . . .5 weeks' pay | | 7 years but less than 8 years . . . . . . . . . . . . . .10 weeks' pay |
| 3 years but less than 4 years . . . . . . . . . . . . . . . .6 weeks' pay | | 8 years or more . . . . . . . . . . . . . . . . . . . . . .11 weeks' pay |
| 4 years but less than 5 years . . . . . . . . . . . . . . . .7 weeks' pay | | |

Unless he deliberately provoked his dismissal, or his conduct constituted a willful or substantial violation of the obligations of his employment, but this limitation shall not apply to moving expenses.

2. The Union may question the propriety of the termination of the Superintendent's services and demand his reinstatement to his job, or severance pay, if any, as the case may be, by filing a grievance within fifteen (15) calendar days following receipt by the Superintendent of the notice to vacate, on the charge that the Employer acted in an arbitrary and unreasonable manner; provided, however, that the time to file a claim for severance pay shall not be limited in a case where the Employer fails to honor an agreement with the Superintendent or the Union to pay said severance pay. If the matter is not adjusted through the grievance procedure, it shall be submitted for final determination to the Arbitrator who may sustain the termination with such severance pay, if any, as the case may be, or order reinstatement. The Arbitrator shall give due consideration to the Superintendent's responsibilities and to the need for mutual cooperation between the Superintendent and the Employer.

3. The Employer's notice to the Superintendent shall be considered held in abeyance and the effective date thereof considered postponed, if necessary, until the matter is adjusted or determined through grievance or arbitration; but the Union must exercise its right to question the Employer's action within the prescribed time and the matter must be processed with reasonable promptness. No Superintendent shall forfeit severance pay on the grounds that he did not vacate his apartment within the prescribed period while his discharge is being grieved.

No Employer shall commence an eviction proceeding prior to an arbitrator's award directing the discharge of the Superintendent. There shall be no interruption of utilities or other essential services to the superintendent's apartment prior to the date an arbitrator's award orders such superintendent to vacate his/her apartment.

4. The Employer, by written notice served personally or by registered mail, may require the Superintendent to vacate his living premises immediately in exceptional cases where his continued presence might jeopardize the tenants, employees, or the building and where the proper operation of the building requires the immediate employment of a replacement. The Union may question the termination of the Superintendent's services by filing a grievance within seven (7) calendar days following the receipt by the Superintendent of the notice to vacate.

5. The provision for arbitration of discharge shall not apply for the first six (6) months of a Superintendent's employment. For grievances arising during the first two (2) months of employment, the presentation period referred to in Article V, shall be 240 days.

6. Any Superintendent resigning because of physical or mental inability to perform his duties shall receive severance pay as provided above in addition to accrued vacation credits. Such a Superintendent may resign and receive severance pay if he submits satisfactory evidence of such inability at the time of termination, unless, because of circumstances connected with his condition, he is unable to comply with the requirement. In the event of a dispute the provisions set forth in Article X, paragraph 20 shall be applicable.



5. If the Employer has an existing plan, as referred to above, it shall not discontinue or reduce benefits without prior Trustee approval and shall remain obligated to the employee(s) for whatever benefits they may be entitled.

6. In no event shall the Trustees or any of them, the Union or the RAB, directly or indirectly, by reason of this Agreement, be understood to consent to the extinguishment, change or diminution of any legal rights, vested or otherwise, that anyone may have in the continuation in existing form of any such Employer pension plan, and the Trustees and the Union shall be held harmless by an Employer against any action brought by anyone covered under such Employer's plan asserting a claim based upon anything done pursuant to Section 5 of this Article. Notice of the pendency of any such action shall be given the Employer who may defend the action on behalf of the indemnitee.

### C. Education and Training Plan

The Employer agrees to contribute to a Safety Fund which will be administered as part of the Thomas Shortman Educational and Training Fund. The rate of contribution to the Thomas Shortman Fund shall continue to be $145.60 per year for each employee.

The purpose of the Safety Fund shall be to establish a program to insure on-the-job safety and to assist employees in other adjunct functions relating to their employment, provided that such program shall meet the requirements of law.

### D. Group Pre-Paid Legal Plan

The Employer shall contribute $223.60 per year to the Pre-Paid Legal Fund payable as the Trustees determine.

### E. Supplemental Retirement and Savings Fund (SRSP)

The Employer shall continue to pay the weekly contribution of $10.00 to the SRSP Fund.

Effective January 1, 2005, the Employer shall contribute an additional $10.00 per week to the SRSP for each employee upon the employee's completion of 25 years of service; provided, however, that if as a result of the 2005 Commercial Building Agreement such employees receive additional pension benefits for years of service in excess of 25, the obligation under this provision shall cease on the effective date of the commencement of such accrual.

### F. Provision Applicable to All Funds

1. If the Employer fails to make required reports or payments to the Funds, the Trustees may in their sole and absolute discretion take any action necessary including but not limited to immediate arbitration and suits at law, to enforce such reports and payments, together with interest and liquidated damages as provided in the Funds' Trust Agreements, and any and all expenses for collection, including but not limited to counsel fees, arbitration costs and fees, court costs, auditors' fees and interest.

When a contributing Employer is regularly and consistently delinquent, the Trustees in their discretion may require such security as they deem necessary.

2. Any contributions and benefits required hereunder shall be increased by any amount and in the same manner as contributions and benefits may be increased in the 2005 Commercial Building Agreement (or its successor) between the Union and the RAB and if service fees are required to be paid, the same fees shall be required to be paid hereunder.

3. The Trustees of the Fund shall make such amendments in the Trust Agreement, and shall adopt such regulations, as may be required to conform to applicable law, and which shall in any case provide that employees whose work comes within the jurisdiction of the Union (which shall not be considered to include anyone in an important managerial position) may only be covered for benefits if the building in which they are employed has a collective bargaining agreement with the Union. Any dispute about the Union's jurisdiction shall be settled by the Arbitrator if the parties cannot agree.

4. There is presently an Agreement between the Union and the RAB which provides that in the event future applicable legislation is enacted, there shall be no duplication or cumulation of coverage, and the parties thereto will negotiate such changes as may be required by law. It is understood that any awards, decisions or agreements concluded between the Union and the RAB shall become binding upon the parties hereto upon the same terms and effective dates.

5. Employees hired on or after July 1, 1994 shall have a waiting period of three months before becoming eligible to be participants in the Funds and no contribution shall be made on behalf of the employees over the three month period.

41. SAVING CLAUSE—If any provision of this Agreement shall be held illegal or of no legal effect, it shall be deemed null and void without affecting the obligations of the balance of this Agreement.

42. COMPLETE AGREEMENT—This agreement constitutes the full understanding between the parties and, except as they may otherwise agree, there shall be no demand by either party for the negotiation or renegotiation of any matter covered or not covered by the provisions hereof.

Dated: New York, NY     May 20     200 5

EMPLOYER

KIMBO APARTMENTS LLC
Firm Name

By Samuel J Grosso
(Signature)

As Agent for KIMBO APARTMENTS LLC

Business Address 240 Parkhill Ave
Staten Island, N.Y 10304

Business Telephone 718-448-6100

SERVICE EMPLOYEES
INTERNATIONAL UNION LOCAL 32BJ,
AFL-CIO

101 Avenue of the Americas
New York, New York 10013-1906
(212) 388-3800

By Samuel J. Grosso     5/31/05

Exhibit C

# UNITHREE INVESTMENT, CORP.

## 240 PARKHILL AVENUE
## STATEN ISLAND, N.Y. 10304
Tel: (718) 448-6100
Fax:(718) 390-0309
TTY: 1-800-662-1220

March 27, 2007

**Service Employees International Union**
**Local 32 BJ**
101 Avenue of the Americas
New York, NY 10013
**Attn:** *Anthony Spataro*
        District 7&9 Supervisor

Dear Mr. Spataro:

This is to confirm our scheduled negotiation session of Thursday, March 29, 2007 at 1:00 p.m.

We are requesting that representatives from the Service Employees International Union, Local 32 BJ, attend this meeting who are authorized to negotiate in good faith concerning all aspects of the Apartment House Agreement including an authorized representative for the Health, Pension, Training, Legal and Supplemental Retirement and Savings (SRSP) Funds.

These negotiations will include contractual agreements for Parkhill I (140-160-180 Parkhill Avenue, SI); Parkhill II (240-260-280 Parkhill Avenue, SI) and St. George Plaza (185-225 Parkhill Avenue, SI).

We agree with you that negotiations be conducted on an immediate basis, in good faith, as we are extremely interested in continuing our mutually acceptable agreements in the best interests of our employees and Management.

Very truly yours,

Samuel Grosso
Vice President

Cc: Jodi P. Goldman, Contracts & Complaints Director

Exhibit D

### OFFICE OF THE CONTRACT ARBITRATOR

John L. Anner
Stuart Bauchner
Noel Berman
Nicholas Cooney
John Dorsey
Howard C. Edelman
Robert Herzog

*To ensure case is still on as scheduled, please call this office 24 hours in advance*

Theodore H. Lang
Marilyn M. Levine
Randi Lowitt
Earl Pfeffer
Elliott D. Shriftman
Walter X. Stanton
Bernard Young

Contract Arbitrators

370 7th Avenue Suite 301
New York, NY 10001
Tel: 212-645-0779
Fax: 212-645-3229

In the Matter of the Arbitration between

MICHAEL FISHMAN, PRESIDENT, LOCAL 32BJ,
SERVICE EMPLOYEES INTERNATIONAL UNION

    and

KIMSO APARTMENTS LLC
C/O UNITHREE INVESTMENTS COMPANY

Notice of Hearing

Case #  24864

PLEASE TAKE NOTICE  that a  hearing re premises:    240-60-80 PARK HILL AVENUE

Has been scheduled for        MAY 23RD 2007        at        9:30 AM

The Union alleges  that a dispute has arisen under the COLLECTIVE BARGAINING

AGREEMENT between the parties concerning

PENOYE RAINEY – CLAIMING REINSTATEMENT TO HIS PRIOR POSITION WITH FULL BACK
PAY, BENEFITS, SENIORITY AND CONTRIBUTIONS TO THE BENEFIT FUNDS LOST BY HIS
TERMINATION

Dated : 5/1/07

Very truly yours,

Dawn E. Cervi
Administrator

To:    KIMSO APARTMENTS LLC
C/O    UNITHREE INVESTMENTS COMPANY
       240 PARK HILL AVENUE
       STATEN ISLAND  NY  10304

cc: Local 32BJ, S.E.I.U,